**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RUTH A. LEWIS, | ) | CASE NO. 5:12-CV-02957 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Ruth A. Lewis ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Commissioner of Social Security ("Commissioner"), denying her

application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to the consent of the parties entered under the

authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On June 30, 2009, Plaintiff filed her application for Social Security Disability

benefits and alleged a disability onset date of June 1, 2004, and a date last insured

("DLI") of March 31, 2007.  (Transcript ("Tr.") 114-120.)  The application was denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (Tr. 80-82, 84-86.)  On August 23, 2011, an ALJ held

Plaintiff's hearing.  (Tr. 34-77.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (Tr. 34-77.)  A vocational expert ("VE") also participated and testified.  (Tr. 34-77.)  On September 9, 2011, the ALJ found Plaintiff not disabled.  (Tr. 16.)  On September 26, 2012, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1-6.)

On November 30, 2012, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On May 25, 2013, Plaintiff filed her Brief on the Merits.  (Doc. No. 16.)  On July 19, 2012, the Commissioner filed her Brief on the Merits.  (Doc. No. 19.)

Plaintiff asserts the following sole assignment of error:  the ALJ improperly evaluated Plaintiff's credibility with regard to her complaints of pain.  (Plaintiff's Brief ("Pl. Br.") at 9-13.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on September 16, 1955, and was 48 years old on her alleged disability onset date.  (Tr. 21.)  She had a high school education and was able to communicate in English.  (Tr. 29.)  She had past relevant work as a nurse's assistant. (Tr. 67.)

### B.  Medical Evidence[1]

---

[1]    In addition to the physical impairments affecting her back, Plaintiff alleged the following non-severe medically determinable impairments prior to the date last insured of March 31, 2007: status post bilateral carpal tunnel release, gastroesophageal reflux disease (GERD), and dysthymic disorder.  (Tr. 22.)  The ALJ determined that Plaintiff was not disabled on the basis of those impairments.  (*Id*.)  Plaintiff does not challenge that

## 1.     Treating Providers

On June 24, 2004, Plaintiff visited her primary care physician complaining of back pain.  (Tr. 302.)  Plaintiff reported that she worked as a nurse's aid, performing repetitive bending and lifting.  (*Id.*)  The physician noted that Plaintiff had been diagnosed with osteoarthritis several years prior and that she was currently taking medication for depression.  (*Id.*)  Plaintiff rated the pain in her back as a "10" on a scale of 1-10, with 10 being the most extreme, but did not display any signs of distress.  (*Id.*)  The physician gave Plaintiff a shot of Toradol for pain control and a prescription for Naprosyn and Flexeril.  (*Id.*)  The following day, Plaintiff sought emergency room treatment, alleging that the medication had not helped her pain.  (Tr. 304.)  She described her pain as sharp in character, a "5" out of 10 in severity, and radiating down her left leg.  (*Id.*)  Plaintiff's physician discharged her with a prescription for Skelaxin and Vicodin.  (*Id.*)

Plaintiff participated in physical therapy but ceased the therapy in early November 2004. (Tr. 308.)  She complained of chronic low back pain following the completion of her therapy.  (*Id.*)  On November 17, 2004, she underwent a lumbar MRI.  (Tr. 306.)  The results showed moderate spinal stenosis at L4-5 and mild to moderate spinal stenosis at L3-4 due predominately to a bulging annulus with associated left posterolateral herniated disc with a caudally displaced fragment and L5 nerve root compression.  (*Id.*)  The MRI also revealed mild to moderate spinal stenosis at L3-4 mainly due to disc bulging.  (*Id.*)

conclusion in her Brief.

From February 2005 through August 2005, Plaintiff sought treatment from Richard S. Brower, M.D.  (Tr. 186.)  On February 14, 2005, Dr. Brower performed a left-sided microdiscectomy at L4-5.  (*Id.*)  Plaintiff responded well to the surgery for several weeks until the pain reoccurred and continued despite several medications.  (Tr. 189.)  Dr. Brower performed revisionary surgery on August 10, 2005.  (Tr. 189-190.)

In January 2006, Plaintiff began treatment with orthopedist Jeffrey Cochran, D.O.  (Tr. 241.)  Dr. Cochran reported Plaintiff's complaints of intermittent sharp back pain with radiation to the left buttock, the posterior aspect of the left thigh, and the knee.  (*Id.*)  A physical examination showed tenderness to palpation in the midline at L4-5 and reduced reflexes in the left Achilles tendon.  (Tr. 242.)  Dr. Cochran diagnosed Plaintiff with severe degenerative disc disease and post laminectomy syndrome at L4-5.  (*Id.*)  Later that month, Plaintiff underwent a series of lumbar steroid injections with Dr. Cochran.  (Tr. 377-378.)

In March 2006, Plaintiff underwent a CT Scan of the lumbar spine which showed mild bulging of the annulus at L5-S1 and moderate bulging of the annulus at L4-5.  (Tr. 270.)  On March 7, 2006, Dr. Cochran performed a discogram at L3-4, L4-5, and L5-S1, which showed severe concordant back pain reproduction.  (Tr.  271-272.)  Based on those results, Dr. Cochran recommended another revisionary surgery, which he performed on March 15, 2006.  (Tr. 264.)  Dr. Cochran's final diagnosis of Plaintiff included a finding of degenerative disc diseases at L4-L5, post laminectomy at L4-L5, dysthymic disorder, tobacco use, and esophageal reflux.  (Tr. 273.)  A post-surgical CAT scan of Plaintiff's lumbar spine found mild bulging at the L5-S1 level and moderate disc bulging at the L4-5 level.  (Tr. 318.)  No further imaging was conducted prior to

4

Plaintiff's DLI of March 31, 2007.

In November 2006, Plaintiff reported that her back felt "ok" but that she was experiencing problems with her right thumb.  (Tr. 366, 368.)  Daniel M. Moretta, D.O., conducted a physical examination, which revealed limited range of motion in the IP joint with triggering and tenderness over the A1 pulley region of the flexor tendon with nodular swelling and crepitance in addition to the triggering.  (*Id.*)  Dr. Moretta gave Plaintiff a steroid injection in her right thumb.  (*Id.*)

On April 5, 2007, Plaintiff requested a month-long prescription refill from her primary care physician because she was leaving the country.  (Tr. 226.)  The next month, Plaintiff returned to Dr. Moretta complaining of recurrent triggering in her right thumb despite wearing her splint.  (Tr. 363.)  Dr. Moretta treated Plaintiff with BactoShield and an injection of Marcaine and Kenalog.  (*Id.*)

### 2.    Agency Assessments

On September 25, 2009, at the Agency's request, Tasneem Khan, Ed.D., reviewed Plaintiff's medical records and concluded that there was insufficient evidence to establish a severe mental impairment.  (Tr. 575.)

In October 2009, at the Agency's request, Myung Cho, M.D., reviewed the medical evidence of record and completed a physical residual functional capacity evaluation.  (Tr. 577-584.)  Dr. Cho reported that Plaintiff could occasionally climb ramps and stairs and stoop, kneel, crouch, or crawl.  (Tr. 579.)  According to Dr. Cho's report, Plaintiff noted that she was capable of doing most things with the exception of more strenuous household chores.  (Tr. 582.)  Dr. Cho found Plaintiff's statements

regarding her functioning as credible and consistent with medical findings.  (*Id.*)

    **C.**    **Hearing Testimony**

        **1.**    **Plaintiff's Hearing Testimony**

At the hearing of August 23, 2011, Plaintiff appeared and testified.  (Tr. 34-77.) The ALJ posed questions based only on the relevant period of June 1, 2004, through March 31, 2007.  Plaintiff testified at her hearing as follows: Plaintiff formerly worked as a nurse's aid prior to the alleged onset date of June 1, 2004.  (Tr. 39.)  She was unable to work during the relevant period because of pain in her lower back, left thigh, and both feet.  (Tr. 51.)  She described her pain as constant and ranging between a five and an eight in severity.  (*Id.*)  She took Vicodin, which eased the pain but caused side effects of dry mouth, fatigue, and difficulty concentrating.  (*Id.*)  Plaintiff could groom herself without assistance but complained that she had difficulty standing which interfered with her ability to do household chores.  (Tr. 41.)  She could spend up to 20 minutes preparing meals and could dust as long as she did not have to bend.  (Tr. 43.)

Plaintiff occasionally visited and received visitors during the relevant time period. (Tr. 44.)  She attended church once or twice a month but could not sit through the entire service.  (*Id.*)  Plaintiff was able to go grocery shopping but could not walk for more than ten minutes and therefore used a motorized cart.  (Tr. 45.)  She had someone load her groceries into and out of her car.  (*Id.*)  Plaintiff ate in restaurants three or four times a year and did not attend movies, sports events, or concerts.  (*Id.*)  She spent approximately 45 minutes per day reading.  (Tr. 46.)  She did not mow the lawn, shovel snow, or do any gardening.  (*Id.*)  Plaintiff could drive her vehicle for about 15 or 20

minutes at a time.  (*Id.*)

During the relevant period, Plaintiff volunteered for a ministry-based charity for approximately eight hours per month.  (Tr. 53.)  She served as the director of information for the ministry.  (Tr. 50.)  In that capacity, she made phone calls, reviewed the organization's financial books, and served as a negotiator between the ministry and another organization.  (*Id.*)  Plaintiff traveled to the Dominican Republic in 2005, shortly after one of her three back surgeries, as part of the volunteer ministry.  (Tr. 55.)  She testified that the total travel time was approximately eight hours.  (*Id.*)  Plaintiff visited the Dominican Republic "a lot of times," but not every year.  (Tr. 60.)  During her trips, she stayed with friends – a doctor and a nurse.  (*Id.*)

Plaintiff could not lift anything more than five or six pounds.  (Tr. 61.)  During the relevant period on what she considered "good days," Plaintiff spent two or three hours per day on her feet.  (Tr. 63.)  On "bad days," she took medication that brought her pain level down to a five.  (*Id.*)

Plaintiff testified that the five-year delay in filing her application for benefits was a result of her wanting to work and not wanting to go on Social Security Disability.  (Tr. 65.)

## 2.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to Vocational Expert (VE) Ted Massey:

> Assume [an individual] could lift and/or carry 20 pounds occasionally and ten pounds frequently.  She could stand and/or walk with normal breaks for about six hours in an eight-hour workday.  She could sit with normal breaks for about six hours in an eight-hour workday. She had no restrictions on her ability to push and/or pull, including the operation hand and/or foot controls, other than as restricted by

7

> her limits on lifting and/or carrying.
>
> She could occasionally climb ramps and stairs.  She could never climb ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch and crawl.  She had no manipulative, visual, communicative or environmental limitations.

(Tr. 68.)  The VE opined that the hypothetical individual described by the ALJ would not be able to perform Plaintiff's past work as a nurse's assistant, but could perform a variety of sedentary jobs.  (Tr. 69.)  The VE testified that the hypothetical individual could perform light jobs such as a bench assembler, a wire worker, or a cashier.  (*Id.*)

The ALJ posed a second hypothetical that was the same in all respects as the first except that instead of having no manipulative limitations, the hypothetical individual was able to frequently handle and finger with her right upper extremity, she was not able to work at unprotected heights or around dangerous moving machinery, she was unable to work in temperatures of less than 50 degrees or have significant exposure of her hands to cold water or frozen items, and she could not use hand-held vibratory tools. (Tr. 70.)  The VE opined that the individual described could perform the same jobs as previously stated, except maybe 20 percent of cashier jobs in stores that require cashiers to handle frozen items.  (Tr. 71.)

The VE further testified that the effect of an individual being "off task 20 percent of the workday" would "pretty much eliminate competitive employment" and may be acceptable in some places, but would likely qualify as a special accommodation.  (*Id.*) Finally, the VE stated that an individual who missed three days of work per month would be unable to sustain employment in any job, as most employers would find that unreasonable.  (Tr. 72.).

8

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

9

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2007.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2004 through her date last insured of March 31, 2007.

3.    Through the date last insured, the claimant had the following severe impairments: (1) degenerative disc disease and osteoarthritis of the lumbosacral spine and retrolisthesis of L4 on L5; status post micro-discectomy at L4-5 on the left on February 15, 2005; status post revision micro-discectomy at L4-5 on the left on August 10, 2005; status post revision decompression of L4-5 bilaterally with inferior facetectomy at L4 bilaterally, posterior lumbar interbody fusion at L4-5 on the right, posterior lumbar interbody fusion at L4-5 on the left, internal fixation of L4-5, and intertransverse process fusion of L4-5 on the left on March 15, 2006, with postoperative diagnoses of degenerative disc disease of L4-5, post-laminectomy syndrome of L4-5 and extensive scarring (arachnoiditis) of L4-5 on the left; (2) trigger finger of the middle fingers bilaterally, status post bilateral tenovaginotomy of both middle fingers on October 15, 2002; (3) tenosynovitis of the right thumb, starting approximately on September 1, 2006; (4) history of hepatitis C, per liver biopsy in 2000, with rather severe reaction to interferon treatment; and (5) history of Raynaud's phenomenon.

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that, through the date last insured of March 31, 2007, the claimant had the residual

functional capacity to perform light work . . . [except that] [s]he could never climb ladders, ropes, or scaffolds . . . was able to only frequently handle and finger with her right upper extremity . . . could not work at unprotected heights or around dangerous moving machinery . . . could not work in temperatures less than fifty degrees Fahrenheit . . . cannot have any significant exposure of her hands to cold water or frozen items . . . [and] could not use hand-held vibratory tools.

6.    Through the date last insured, the claimant was unable to perform any past relevant work.

. . . . .

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2004, the alleged onset date, through March 31, 2007, the date last insured.

(Tr. 19-20.)

## V.   LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the

11

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.   Plaintiff's Assignment of Error

Plaintiff's sole assignment of error takes issue with the ALJ's assessment of Plaintiff's credibility regarding her complaints of pain.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the

12

allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).

Rather, the determination "must contain specific reasons for the finding on credibility,

supported by evidence in the case record, and must be sufficiently specific to make

clear to the individual and to any subsequent reviewers the weight the adjudicator gave

to the individual's statements and the reason for that weight." *Id.*

> When a claimant complains of disabling pain, the Commissioner must apply a

two-step test known as the "Duncan Test" to determine the credibility of such

complaints. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  First,

the Commissioner must examine whether the objective medical evidence supports a

finding of an underlying medical condition that could cause the alleged pain. *Id.*

Second, if there is such an underlying medical condition, the Commissioner must

examine whether the objective medical evidence confirms the alleged severity of pain,

or, alternatively, whether the objectively established medical condition is of such a

severity that it can reasonably be expected to produce the alleged severity of pain. *Id.*

In making this determination, the ALJ must consider all of the relevant evidence,

including six different factors.[2]  *See Felisky,* 35 F.3d at 1039–40 (citing 20 C.F.R. §

---

[2] These factors include the following:
> (1) the claimant's daily activities;
> (2) the location, duration, frequency, and intensity of the claimant's alleged pain;
> (3) precipitating and aggravating factors;
> (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;
> (5) treatments other than medication that the claimant has received to relieve the pain; and
> (6) any measures that the claimant takes to relieve his pain.

13

404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may

satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman*

*v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per

curiam).

      Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not

all, of the relevant factors in his assessment of Plaintiff's condition. (Tr. 24-27.)  The

ALJ examined Plaintiff's daily activities, her treatments and her responses to those

treatments, the clinical examination findings, and the physician statements of record.

Thus, the ALJ considered the relevant evidence.  (*Id.*)

      Moreover, in assessing Plaintiff's complaints of pain, the ALJ determined that

Plaintiff was not credible because her statements concerning the intensity, persistence,

and limiting effects of her alleged symptoms were inconsistent with objective medical

evidence.  (Tr. 24.)  Specifically, the ALJ noted that from January 2005 through March

2006, Plaintiff underwent four surgeries on the discs in her lumbar spine, and the most

recent pre-DLI imagings indicate that those surgeries were successful in alleviating the

compression on the impinged nerve roots.  (*Id.*)  Furthermore, the ALJ pointed to the

report of a successful surgery on March 15, 2006, and clinical signs of only moderate

physical restriction to show that the record did not support Plaintiff's allegations that she

was disabled as of June 1, 2004.  (*Id.*)  While the ALJ acknowledged that Plaintiff

presented with tenderness and some limitations in the range of motion throughout her

lumbar spine until the DLI, the ALJ further noted that signs of only tenderness to palpation are not sufficient to support Plaintiff's allegations of "10 out of 10" pain.  (Tr. 25.)  Additionally, the ALJ found that, since Plaintiff appeared in no apparent discomfort in June of 2004 despite her complaints of level 10 pain, this detracted from her credibility, as it is doubtful that an individual experiencing the worst imaginable pain would show no signs of distress. (*Id.*)

Plaintiff also argues that the ALJ improperly evaluated her complaints of pain by assuming that a disabled person could not be active with volunteerism or travel on an airplane.  Plaintiff asserts that she only volunteered for approximately eight hours per month and that her travel did not involve prolonged standing or walking.  However, the ALJ did not disregard those facts.  Instead, the ALJ reasonably concluded that performing mission work in the Dominican Republic after undergoing multiple lumbar surgeries suggests that the Plaintiff could not be experiencing the worst imaginable pain prior to her DLI.  (Tr. 25.)  The ALJ found that Plaintiff's allegations of "10 out of 10" pain were inconsistent with an eight-hour trip that included several hours on an airplane.  (*Id.*)  The ALJ's reliance on Plaintiff's mission work in the Dominican Republic is based on evidence in the record, as Plaintiff testified that she worked as the director of information for a non-profit organization and traveled to the Dominican Republic during the relevant period to perform volunteer work for that organization.  (Tr. 47-48, 50, 57-61.)  This is, of course, inconsistent with other record evidence – including Plaintiff's testimony – that she underwent multiple surgeries and was experiencing "10 out of 10" pain.  This inconsistency is an appropriate basis for an adverse credibility finding.  *See Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)

15

("Discounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.")[3]

Plaintiff also contends that the ALJ improperly determined that she was not direct and forthright in her testimony regarding her travels.  According to the ALJ, Plaintiff was not entirely candid in her testimony, first denying her trips and then admitting to undertaking them but experiencing significant pain in doing so.  (Tr. 25.)  The Transcript demonstrates that there was confusion about Plaintiff's trips.  (Tr. 47, 49).  Whether Plaintiff was not immediately truthful about the *existence* of her trips or simply confused about the exact *timing* of those trips is of little consequence; that she voluntarily undertook a mission trip to the Dominican Republic shortly after surgery and while alleging extreme pain is sufficient to call Plaintiff's credibility into question.  Standing alone, this basis for finding Plaintiff not credible would perhaps be insufficient.  However, coupled with the basis discussed above, and given the deference accorded to the ALJ's conclusions on this issue, substantial evidence supports the ALJ's adverse credibility finding, and Plaintiff's arguments on this point are not well taken.

Finally, Plaintiff argues that it was improper for the ALJ to ignore Plaintiff's most recent MRI from May 2009, which showed arachnoiditis.  Plaintiff did not file her Title II application until June 10, 2009, more than five years after the alleged disability onset.  (Tr. 25.)  According to the ALJ, this wide discrepancy between the filing date and the

---

[3]    Plaintiff testified that she delayed filing for benefits because she anticipated returning to work.  (Tr. 65.)  The ALJ's determination that Plaintiff did not view her impairments as disabling during the time she was insured is reasonable and further detracts from her credibility. (Defendant's Brief at 10, *citing Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).*)

alleged onset date suggests that Plaintiff's pain began to worsen closer to June 10, 2009, as compared to the alleged onset date of June 1, 2004.  (*Id.*)  Plaintiff did not provide any law supporting her assertion that the ALJ should have considered evidence from outside the relevant period of June 1, 2004, through March 31, 2007.  Moreover, there is no evidence in the record that the Plaintiff's condition, as reflected in the May 2009 MRI, relates back to the impairment that existed prior to the DLI.  Thus, the ALJ properly did not view it as probative of Plaintiff's functional ability during the relevant period.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*

U.S. Magistrate Judge

Date: August 13, 2013

17